IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

CHEVRON CORPORATION

                Petitioner,

v.

JONATHAN S. SHEFFTZ

                Respondent,

Civil Action No: 10-mc-10352-JLT

**LEAVE TO FILE GRANTED
NOVEMBER 16, 2010**

**RESPONDENT'S AND ECUADORIAN PLAINTIFFS' JOINT BRIEF
IN OPPOSITION TO CHEVRON CORPORATION'S *EX PARTE* APPLICATION
FOR DISCOVERY UNDER 28 U.S.C. § 1782**

# TABLE OF CONTENTS

INTRODUCTION      1

BACKGROUND ................................................................................................................. 4

ARGUMENT ................................................................................................................... 13

    **I.**      CHEVRON'S REQUEST FOR DISCOVERY FROM MR. SHEFFTZ IN AID OF THE LAGO AGRIO LITIGATION IS INAPPROPRIATE AND SHOULD BE DENIED ...................................................................................... 13

          A.      Chevron's Application Is an Attempt to Circumvent the Proof-Gathering Restrictions of Ecuador ............................................. 13

          B.      Although Chevron Argues Here that the Lago Agrio Court Will be Receptive to the Discovery Sought, Chevron Has In Fact Admitted to the Arbitration Panel  that the Lago Agrio Court is Not Interested in Further Evidence From Chevron on the Issue of Damages ................................................................................................. 17

          C.      Chevron's Application Is an Intrusive and Burdensome Fishing Expedition That This Court Must Deny .................................................. 20

    **II.**     CHEVRON'S REQUEST FOR DISCOVERY FROM MR. SHEFFTZ IN AID OF THE PRIVATE ARBITRATION IS INAPPROPRIATE AND SHOULD BE DENIED ...................................................................................... 22

          A.      Chevron's Application as to the Private Arbitration Fails Because the Arbitration Panel Is Not a "Foreign or International Tribunal" .......... 22

          B.      The International Arbitration Is Not Receptive to the Kind of Discovery Sought from Mr. Shefftz and Chevron's Application for Discovery in Aid of the Arbitration Is Not Congruent with the Company's Strategic Choice to Engage in Arbitration in the First Instance ................................................................................................... 27

               **1.**      Chevron Cites No Affirmative Authority for the Proposition That the International Arbitration Would Authorize the Discovery It Now Seeks ......................................... 27

               **2.**      The Kind of Discovery Sought from Mr. Shefftz Is Either Prohibited or Strongly Disfavored in the International Arbitration Process ........................................................................ 28

i

C.     Chevron Has No Right to Depose, in Aid of an International Arbitration, a Testifying Expert in a Separate and Distinct Civil Litigation – Particularly an Expert Whose Role Is Clearly Irrelevant to the Arbitration ...................................................................... 29

**III.**    CHEVRON IS NOT ENTITLED TO ISSUE PRECLUSION AS A MATTER OF BOTH LAW AND FAIRNESS ..................................................... 31

**IV.**    Assuming that chevron is entitled to *any* discovery EITHER IN AID OF THE LAGO AGRIO LITIGATION, THE ARBITRATION, OR BOTH, CHEVRON is MOST certainly not entitled to everything that it seeks by way of its overbroad proposed subpoena.............................................................. 34

A.     Even If the Court Finds that Chevron is Entitled to Discovery Under the Theory that Respondent is a Testifying Expert in the Lago Agrio Litigation, the Proposed Subpoena Must be Limited ............ 34

1.     The Court Should Apply the Newly Amended Version of Fed. R. Civ. P. 26 to Limit the Disclosure of Draft Expert Materials and Attorney-Expert Communications ......................... 34

2.     Even Assuming that the Amended Version of Rule 26 Should Not Apply, Chevron's Absurdly Broad Proposed Subpoena Exceeds Even What Is Permissible Under the Former Iteration of the Rule .......................................................... 36

B.     Chevron Cannot Credibly Argue That Mr. Shefftz May Be Deemed a "Testifying Expert" as to the Arbitration and Any Discovery in Furtherance of the Arbitration Must Be Limited to Mr. Shefftz's Contacts, If Any, with the Government of Republic of Ecuador – Anything Else is Simply Irrelevant to the Arbitration ........ 39

CONCLUSION ......................................................................................................................... 40

## INTRODUCTION

Jonathan S. Shefftz (hereinafter "Mr. Shefftz" or "Respondent"), who earned a Master's degree in Public Policies from the John F. Kennedy School of Government at Harvard University, is one of the nation's leading financial economists. (Chevron Lago Agrio RJN, Ex. S, at A-1 to A-7.) Mr. Shefftz has developed economic models and analysis for the United States Environmental Protection Agency (USEPA), the Department of Energy of the United States, and many other federal and state agencies, and has performed work for multiple private corporations, industrial groups, and non-governmental organizations. (*Id.*) In the context of environmental actions performed under various standards and regulations in the United States, Mr. Shefftz has designed cash flow from companies to calculate the economic benefit obtained by them during their failure to comply with various mandatory standards, which constitutes unjustified enrichment. (*Id.*) Mr. Shefftz has been certified as an expert in various courts, including Federal Courts, and the Administrative Court of a federal agency in the United States. (*Id.*) Yet, notwithstanding his impeccable qualifications, and without offering any evidence other than Mr. Shefftz's audacity to write a report for the plaintiffs ("Plaintiffs") in a multi-billion dollar environmental and human rights litigation pending against Chevron Corporation ("Chevron") in Ecuador (the "Lago Agrio Litigation"), Chevron boldly speculates that Mr. Shefftz may in fact be a fraudster in order to justify subjecting him to a deposition and document discovery pursuant to 28 U.S.C. § 1782.

Enough is enough. Chevron's § 1782 proceeding against Mr. Shefftz is one of what has, over the course of the past year, ballooned to a total of seventeen (17) separate § 1782 proceedings, filed in fifteen (15) different United States District Courts throughout the Country

against the Lago Agrio Plaintiffs' current and former counsel, consulting experts, and their sub-consultants.  Indeed, Chevron has targeted with § 1782 subpoenas no less than twenty-five (25) separate persons or entities affiliated with the Plaintiffs.  This unprecedented invocation of § 1782 ostensibly to create a litigation in the U.S. with a life of its own in parallel to a foreign proceeding – an abuse of the statute that could not possibly have envisioned by its drafters – has now resulted in no less than 275,000 pages of documents produced to Chevron.  These § 1782 actions have further resulted in the taking of eleven (11) depositions, with at least eleven (11) more on the horizon.[1]

It has become increasingly clear that, absent judicial intervention, Chevron has no intention of ever halting the novel § 1782 cottage industry that its lawyers have created.  The process is simply too effective at diverting the limited resources of the Plaintiffs – members of the indigenous communities of the Ecuadorian Amazon basin – and at serving as a deterrent to any consultant or lawyer who dare take up their seventeen-year plight.[2]  In short, as stated by one district court that could foresee how Chevron's § 1782 campaign will play out if left unchecked:

---

[1] The latter statistic is as ironic as it is unjust.  Chevron fought for eight years in the late 1990s and early 2000s to re-venue this case from its backyard in the Southern District of New York – where the case was originally filed by Plaintiffs in 1994 – to Ecuador.  If it had remained in the United States, Chevron would have long been capped at its 10-deposition limit under the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 30(A)(2)(A)(I).  Instead, Chevron has thus far been permitted to have its cake (the full advantage conferred by the unusually liberal discovery – particularly as compared to Ecuador – authorized by the Federal rules) and eat it too (avoidance of any limitation on discovery inherent in the Federal Rules).  As discussed at Section IV, *infra*, this state of affairs cannot be allowed to persist.

[2] Emboldened by its success in earlier proceedings, Chevron has become much more transparent about its strategy of intimidation.  To wit, the practices of Chevron's counsel in depositions have become so abusive – including opening the deposition of an environmental consultant by asking him if he is familiar with various criminal statutes – as to compel Plaintiffs to seek relief from the district court in which the action is pending.  [*See generally* Moll Decl., A,

> [I]t is important to note at the outset that this proceeding, initiated pursuant to 28 U.S.C. § 1782, is not an opportunity to put on a full trial . . . . Chevron had an opportunity to litigate this matter in the United States and strongly opposed jurisdiction in favor of litigating in the Ecuadorian courts. While fraud on any court is a serious accusation that must be investigated, it is not within the power of this court to do so, any more than a court in Ecuador should be used to investigate fraud on *this* court . . . . *This limited proceeding is quickly spiraling out of control.*

*Chevron Corporation v. Mark Quarles*, No. 3:10-cv-00686, Dkt. 108, at 2-3 (M.D. Tenn.) (emphasis added).

It is the right time for a line to be drawn. Although Chevron attempts to give this Court the impression that Chevron's pursuit of Mr. Shefftz raises the same issues that have been raised in prior § 1782 proceedings in which Chevron has successfully obtained discovery, nothing could be further from the truth. Chevron has heretofore been able to justify its massive incursion by invoking the specter of fraud, motivating courts to grant discovery even where the law might counsel otherwise. Chevron takes the same tack here, but its "fraud" premise is now attenuated to the point of becoming transparent. Having dragged the Plaintiffs throughout the courts of the United States and having received thousand of pages of discovery, more depositions than a party would be entitled to in a litigation governed by the Federal Rules, and a wealth of media sound bites, it is time for Chevron to return to litigating this case in its chosen forum – Ecuador.

---

at 5.]   Moreover, Chevron has taken to threatening prospective counsel through the media: "More immediately, will the embarrassment be too great for the Am Law 100 firm that plaintiffs have said is on the verge of joining their team? *'Anyone jumping into bed with plaintiffs at this point needs to understand what they're signing on to,'* Chevron spokesman Kent Robertson said. *'They will be funding a fraudulent lawsuit.'"* (Moll Decl., Ex B.) (emphasis added).

3

## **BACKGROUND**

Chevron has dumped thousands of pages of documents on this Court in support of its attempt to conflate the limited factual issues germane to the instant § 1782 proceeding with the very distinct issues presented by Chevron's numerous earlier-filed proceedings in district courts throughout the country.   Respondent and the Plaintiffs will thus attempt to limit their presentation of this 17-year litigation to the background necessary to provide context to the Court, and the circumstances of the respondent's limited involvement in the Lago Agrio Litigation.

**A.      The Ecuadorian Case Underlying the Instant § 1782 Discovery Proceeding: Chevron Fights for Eight Years to Move the Case to Ecuador from the United States, Where it was Originally Filed by Plaintiffs on Chevron's Home Turf.**

From 1964 to 1992, Chevron owned an interest in an approximately 1,500 square-mile concession in Ecuador that contained numerous oil fields and more than 350 well sites.  ( Moll Decl., Ex C, ¶ 13.)  From 1964 until at least 1990 – when it ceased its role as operator of the concession area – Chevron engineered and presided over what some experts believe is one of the worst oil-related environmental disasters the world has ever known, (*id.*), perhaps even larger in scope and impact than the Deepwater Horizon/BP Oil Spill.  Chevron deliberately dumped many billions of gallons of waste byproduct from oil drilling directly into the rivers and streams of the rainforest covering an area roughly the size of Rhode Island.  (*Id.*)

In 1993, the Amazon communities filed a federal class-action lawsuit against Chevron's predecessor, Texaco, Inc., in the United States District Court for the Southern District of New York, then site of Chevron's global headquarters.  Plaintiffs "sought money damages under theories of negligence, public and private nuisance, strict liability, medical monitoring, trespass,

civil conspiracy, and violations of the Alien Tort Claims Act," as well as "extensive equitable relief to redress contamination of the water supplies and environment." *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 473 (2d Cir. 2002). From the lawsuit's inception, Chevron fought vigorously to re-venue the case from the Southern District of New York to the courts of Ecuador.[3] Chevron's motion on *forum non conveniens* and international comity grounds rested on two principal assertions: first, that the Ecuadorian courts provided an adequate, fair, and neutral forum; second, that the evidence and the witnesses were in Ecuador.

For nine years, Chevron touted the virtues of the Ecuadorian judicial system, submitting numerous affidavits from experts and its own counsel and repeating these assertions in extensive briefing. (*See*, *e.g.*, Affidavit of Dr. Alejandro Ponce Martinez dated Feb. 9, 2000, at ¶ 2 ("the courts in Ecuador provide a totally adequate forum"); Affidavit of Dr. Rodrigo Perez Pallares (Texaco's attorney) dated Dec. 1, 1995, at ¶ 7 ("the Ecuadorian courts provide an adequate forum for claims such as those asserted by the plaintiffs"); Texaco Inc.'s Memorandum of Law in Support of Its Renewed Motions to Dismiss Based on *Forum Non Conveniens* and International Comity, dated Jan. 11, 1999, at 18 ("Ecuador's judicial system provides a fair and adequate alternative forum") The Court of Appeals for the Second Circuit ultimately agreed and dismissed the case on the condition that, when re-filed in Ecuador, Chevron would not chShefftzge the jurisdiction of the Ecuadorian courts. *See Aguinda*, 303 F.3d at 476.

After final dismissal of the *Aguinda* action in 2002, the Plaintiffs re-filed the case in Lago Agrio, Ecuador (the "Lago Agrio Litigation"); trial began in 2003. The case has been hotly

---

[3] *See Aguinda v. Texaco, Inc.*, 945 F. Supp. 625 (S.D.N.Y. 1996), *vacated by Jota v. Texaco, Inc.*, 157 F.3d 153 (2d Cir. 1998); *Aguinda v. Texaco, Inc.,* 142 F. Supp. 2d 534 (S.D.N.Y. 2001), *aff'd* 303 F.3d 470, 476 (2d Cir. 2002).

contested and vigorously defended by Chevron.   Indeed, in May 2009, Chevron spokesman Donald Campbell articulated the company's litigation strategy: "We're going to fight this until hell freezes over. And then we'll fight it out on the ice."  (Moll Decl., Ex D.)  The record contains more than 200,000 pages of evidence, roughly 63,000 chemical sampling results produced by laboratories contracted by both parties and the court experts, testimony from dozens of witnesses, and tens of judicial field inspections of former Chevron wells and production sites conducted over a five-year period under the oversight of the Lago Agrio Court.  Soil samples from the production wells and separation stations inspected reveal extensive contamination in violation of Ecuadorian law.  (Moll Decl., Ex C, ¶ 28.)  Notwithstanding Chevron's claims that it is somehow being railroaded by the Ecuadorian court system, the case has now been litigated in Ecuador for approximately eight years.

**B.     Chevron Asks a Private Arbitration Panel – an *Ad Hoc* Panel Consisting of Three Private Individuals – to Order to the Government of Ecuador to Shut Down the Lago Agrio Trial.  The Plaintiffs Are Not a Party to this Arbitration, in which Chevron Alleges Wrongdoing on the Part of the Republic of Ecuador.**

> **1.     *Chevron Elects to Bring a Private Arbitration and Selects UNCITRAL Rules of Procedure to Govern the Arbitration***

On September 23, 2009, Chevron filed a "notice of arbitration" to resolve an "investment dispute" with the Republic of Ecuador.  (*See* Dkt. 1-9, at ¶ 70.)  In bringing its arbitral claims, Chevron alleged that "Ecuador's conduct . . . violate[d] its investment agreements," *i.e.*, the Republic of Ecuador failed "to provide effective means of enforcing rights with respect to investment and investment agreements."  (*Id.* at ¶ 69.)

Chevron's "investment dispute" claims were brought under a mechanism provided in the United States-Ecuador Bilateral Investment Treaty (the "the U.S.-Ecuador BIT") that allows for

international arbitration for "dispute[s arising] between a Party and a national or company of the other Party." (*Id.* at ¶ 70.) Under the U.S.-Ecuador BIT's terms, the "investor" chooses whether to pursue its investment claims through litigation or arbitration. (*See* Moll Decl., Ex E.) If the investor chooses arbitration, the investor must also choose what set of arbitration rules the investor wishes to apply. (*Id.* ("The investor may choose between the International Center for the Settlement of Investment Disputes (ICSID)," "ad hoc arbitration using the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL)," or "another arbitral institution or set of arbitral rules.").) It is, in fact, "the choice of the investor" how, where, and under what rules to bring an arbitral claim. (*See id.*) The United Nations Commission on International Trade Law, which drafts the UNCITRAL rules, does not have role in the arbitration – other than supplying a set of rules for the arbitration to follow.

Under the UNCITRAL Rules, arbitrations proceed *in private* – there is no transparency in process or procedure and the parties are able to ensure secrecy over virtually every step in the arbitral process. (Moll Decl., Ex F) (Art. 28: "Hearings shall be held in camera . . . ."; Art. 34: "An award may be made public with the consent of all parties . . . .").)

Chevron, as noted in its notice of arbitration, "propose[d] that this dispute be adjudicated by a panel of three (3) arbitrators chosen as provided by the UNCITRAL Arbitration Rules." (Dkt. 1-9, at ¶ 74.) The company also selected its own arbitrator, pursuant to those rules. (*Id.* at ¶ 75.) Chevron's arbitrator is not a member of any court or a "permanent" judge – he is an academic (Director of American University's Center on International Commercial Arbitration) and a "consultant on business and international law matters." (*See* Moll Decl., Ex G.)

2. ***The Arbitration Panel Does Not Know the Identity of Mr. Shefftz and Chevron's "Due Process" Claims Relate Only to the Lago Agrio Court's***

***Grant of the August 2, 2010 Order Allowing a Supplemental Damages
Submission, Not the Substance of Mr. Shefftz's Report***

On September 6, 2010, the company filed a "Memorial on the Merits" (the main paper which argues the substantive merits of the arbitration claim) with the arbitration panel.  (*See generally* Dkt. 1-10.)  **The 282-page brief with 547 paragraphs, references the September 16, 2010 supplemental damages submission only *once*** – and even then, the reference is a passing argument that the Lago Agrio court's granting of an order allowing for the submission of supplemental damages reports was a calculated effort by the Republic of Ecuador "to Restrict Chevron's Due Process Rights."  (*See* Dkt. 1-10, ¶ 243-44.)  Thus, the only issue Chevron has placed before the arbitration panel related to the September 16, 2010 damages submission is whether the Lago Agrio Court's August 2, 2010 order allowing the parties to file a supplemental submission violated Chevron's due process rights.[4]

Chevron now claims that discovery is needed in aid of an international arbitration "discovery to shed light on Plaintiffs' attempt to whitewash the real source of Respondent's opinion."  There is no evidence before this Court, however, that the international arbitration panel so much as knows of the identity of Mr. Shefftz, let alone desires copies of his draft reports.

**C.     Chevron's *First* Wave of § 1782 Applications:  Chevron Obtains Discovery From Several U.S. Courts Concerning Contacts Between Plaintiffs and an Ecuadorian Court-Appointed Expert and Concerning the Involvement of Plaintiffs' Consulting Experts in the Preparation of That Expert's Report.  But the Nature of the Rulings**

---

[4] Not surprisingly, while Chevron submitted its Memorial on the Merits as an Exhibit in the current proceeding, (*see* Dkt. 1-10), the company sparsely cites the document for background founds only, wholly unrelated to Mr. Shefftz and the August 2, 2010 order by the Lago Agrio court allowing for supplemental damages submissions.

**are Wildly Disparate, and One Court Ultimately Observes that Chevron's Efforts to Re-Litigate the Case in the U.S. are "Quickly Spiraling Out of Control."**

Between December 2009 and August 2010, Chevron filed applications for discovery pursuant to § 1782 against several of Plaintiffs' U.S.-based environmental consultants, on the theory that these consultants had some involvement in the preparation of an expert report submitted by a court-appointed expert in the Lago Agrio litigation. This expert, Engineer Richard Cabrera Vega, was appointed by the Lago Agrio Court in March 2007 to serve as the "global damages assessment" expert – charged with submitting to the court a comprehensive submission that would assist the court in arriving at an appropriate valuation for each category of damages at issue in the case. (Moll Decl., Ex. I, ¶¶ 8-13.) Mr. Cabrera performed no fewer than forty-eight separate site inspections on his own, in constant communication with the court. (*Id.* ¶ 13.) At the inspections and otherwise, Chevron attempted to impede Mr. Cabrera and delay the proceedings at every turn.[5] (*Id.*) Throughout the process, Chevron filed multiple motions attacking Mr. Cabrera's qualifications, credibility, processes, and findings.[6] (*Id.*)

Mr. Cabrera submitted the global damages assessment (the "Cabrera Report") to the Lago Agrio Court on approximately April 1, 2008. However, it was not until December 2009 that

---

[5] Contrary to court orders, Chevron disturbed the areas where Cabrera was scheduled to perform testing, *e.g.*, rolling in with machines that would compromise the ground to be sampled, interfering with Mr. Cabrera's ability to sample there. (*Id.*)

[6] Chevron's attacks on Cabrera were not limited to court proceedings. On November 6, 2007, Mr. Cabrera filed an official complaint with the Lago Agrio Court claiming that members of Chevron's legal team in Ecuador subjected him to threats and insults when he would conduct his field work. ( Moll Decl., Ex. I, ¶ 15.) In the complaint, Mr. Cabrera asserted that unknown persons were following him and members of his technical team in Lago Agrio, the town that he used as a base for his work in inspecting sites in nearby oil fields. (*Id.*) As a result of this complaint, the Lago Agrio Court mandated that Mr. Cabrera and members of his technical sampling team would be given law enforcement protection when conducting field work. (*Id.*)

9

Chevron filed its initial *ex parte* § 1782 petition seeking discovery from a consulting expert that Chevron had reason to believe played a role in preparing the Cabrera Report.[7]   *See In re: Application of Chevron Corporation*, 1:10-cv-00047-MSK-MEH, Dkt. 1 (D. Colo.)   Over the next few months, Chevron filed approximately eight additional § 1782 applications in district courts around the country, most targeted at various sub-consultants who had contributed to the Cabrera Report in some way.   Chevron incorporated the video evidence, hours of deposition testimony, and hundreds of thousand of pages of documentary evidence that it obtained from these proceedings into numerous filings with the Lago Agrio Court, each of which laid out in great detail Chevron's theory that Plaintiffs' involvement with the Cabrera Report required not only that the report be stricken, but that the entire case be dismissed.   (*See, e.g.,* Moll Decl., Ex. H.)   Although the Lago Agrio Court has not to this point adopted Chevron's advocated Draconian position, the fact remains that the supposed Cabrera "fraud" is now before the Lago Agrio Court.

---

[7] At that time, Chevron had at least a plausible justification for filing its application *ex parte*. But the fact that Chevron continues this practice after litigating against Plaintiffs' U.S. counsel for approximately one year in district courts throughout the country – indeed, the instant application was filed *ex parte* – is an egregious abuse of process and reflects a desire by Chevron to deny Plaintiffs due process of law.   *See In re Merck & Co.*, 197 F.R.D. 267, 270-71 (M.D.N.C. 2000) ("Nothing in Section 1782 states that the application is to be made *ex parte*, much less that the Court must entertain the application *ex parte*.   Moreover, such a reading would seem to be contrary to the purpose of the statute, which is to help promote evenhanded justice and a sense of fair treatment."); *see also* Hans Smit, *American Assistance to Litigation in Foreign and International Tribunals: Section 1782 of Title 28 of the U.S.C. Revisited*, 25 Syracuse J. Int'l L. & Com. 1 (1998) ("[I]t is an elementary precept of due process that . . . *ex parte* applications are improper, and adequate notice of the [Section 1782] application should be given both to the person who is to produce the evidence and to adverse parties. . . .   At the least, the court should consider assessing costs and attorney's fees against the party that made the original application.").

**D.**      **Chevron's *Second* Wave of § 1782 Applications: Chevron Attempts to Justify its Continued Litigation of this Ecuadorian Case in the U.S. – A Forum Chevron Rejected Many Years Ago – by Claiming that the Reports Prepared by the Respondent and Several Other Highly Respected U.S.-Based Experts in September 2010 is Somehow Related to the Alleged "Fraudulent" Preparation of the Cabrera Report, Which Occurred Over Two Years Earlier.**

Chevron had the opportunity to ask the Lago Agrio Court to appoint a second expert (in addition to Mr. Cabrera) for purposes of the global damages assessment, but instead declined to do so, choosing the path of the obstructionist rather than using the damages assessment process as a means of constructively advocating its viewpoint on damages.   (Moll Decl., Ex I.) Nonetheless, Chevron continued to assert that it had somehow been *frozen out* of the damages assessment process in the Lago Agrio Trial, and was being victimized.   Although Plaintiffs believe that Chevron was not truly entitled to a second chance to make its case on damages to the Lago Agrio Court, the Lago Agrio Plaintiffs ultimately decided to attempt to put to rest any further controversy on the matter by petitioning the Lago Agrio Court to allow both parties to put in an additional submission on damages.   (Moll Decl., Ex J.)   On August 2, 2010, recognizing the parties' heated disagreement on this issue and noting that the Court was not obligated to consider the findings set forth in the Cabrera Report, the Lago Agrio Court granted Plaintiffs' request and invited the parties to file supplemental submissions justifying their respective positions on damages by September 16, 2010.  (Moll Decl., Ex K.)

Both parties filed their damages submissions with the Lago Agrio Court on September 16 (the "September 16, 2010 supplemental damages submission" or "supplemental damages submission").   (Moll Decl., Ex L); (Moll Decl., Ex M.)   And, indeed, both parties appended to and relied on in their respective submissions numerous reports prepared by U.S.-based experts.

11

(Moll Decl., Ex N.)  One of the reports appended to Plaintiffs' submission was a report prepared by the Respondent, Jonathan S. Shefftz, entitled Analysis of Unjust Enrichment.  (Chevron Lago Agrio RJN, Ex. S, at 1-7.)  Mr. Shefftz's report "details how Chevron benefited with significant illegal economic gains by disregarding several environmental regulations for many years, using this money to invest in other businesses."  (Moll Decl., Ex L, **at 17.**)  Mr. Shefftz "calculates the range of unjustified enrichment obtained from evading compliance costs that the applicable mandatory standard would have generated during their Ecuadorian operations."  (*Id.*)

Despite the fact that (1) Mr. Shefftz is completely forthcoming about the fact that he is not a "neutral" expert, but rather, is Plaintiffs' expert, and (2) Mr. Shefftz's report is open and transparent in its reliance on and citation to the Cabrera Report, among other sources, Chevron claims that it "is entitled to the requested discovery to determine how Respondent fits into the known history of collusion and fraud in the Lago Agrio Litigation, and to support Chevron's claims against the Republic of Ecuador in the Treaty Arbitration." (Chevron Memo. of Law, at 3.)  Tellingly, other than accusing Plaintiffs of previous bad behavior having nothing to do with Mr. Shefftz's report, Chevron does not articulate precisely how anything about Mr. Shefftz's report could actually be considered "fraudulent."

On the same day that it filed the instant action, Chevron filed five parallel § 1782 applications in four other district courts seeking substantially similar discovery from other experts who prepared reports appended to Plaintiffs' supplemental damages submission. Notwithstanding the fact that the Lago Agrio Court has clearly expressed its lack of interest in this discovery, Chevron insists that the discovery must be had in aid of the Lago Agrio litigation. (*See* Chevron Memo. of Law, at 11-13; Section I(B), *infra*.)  Chevron also insists that exploring

the basis for the scientific opinions expressed by various American experts retained by Plaintiffs'

will somehow be relevant to an Arbitration that is about the Ecuadorian government's allegedly

unfair treatment of Chevron.  (*See* Chevron Memo. of Law, at 12; Section II(C), *infra*.)

## ARGUMENT

I.    **CHEVRON'S REQUEST FOR DISCOVERY FROM MR. SHEFFTZ IN AID OF THE LAGO AGRIO LITIGATION IS INAPPROPRIATE AND SHOULD BE DENIED**

Chevron's attempt to obtain 28 U.S.C. § 1782 discovery from Mr. Shefftz stretches the

statute beyond its recognized purpose and must be disallowed.  The Supreme Court has held a

district court must weigh certain discretionary factors to prevent unwarranted and unhelpful

grants of discovery pursuant to § 1782.  *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S.

241, 264-65 (2004).  Those factors, which include, *inter alia*, whether a foreign tribunal will be

receptive to United States court assistance, whether the § 1782 request is an attempt to

circumvent foreign proof-gathering restrictions, and whether the documents and testimony

sought are unduly intrusive or burdensome, do not favor discovery here.  *Id.*  First, the type of

discovery Chevron seeks from Mr. Shefftz exceeds what is permitted in a civil law country such

as Ecuador.  Second, the Lago Agrio Court has indicated its unwillingness to review additional

scientific and medical evidence beyond the parties' September 16 supplemental damages

submissions.  Third, the instant Application is nothing more than an intrusive and burdensome

fishing expedition, which Chevron seemingly concedes by acknowledging that it has no facts

connecting Mr. Shefftz to the purported fraud involving the Cabrera Report.  This Court

therefore must deny Chevron's application for discovery pursuant to § 1782.

A.    **Chevron's Application Is an Attempt to Circumvent the Proof-Gathering Restrictions of Ecuador**

District courts must consider "whether a § 1782(a) request conceals an attempt to circumvent foreign proof-gathering restriction or other policies of a foreign country or the United States." *Intel*, 542 U.S. at 265. "[T]his factor is calculated to shield against an abuse or end run around a foreign jurisdiction's policies." *In re Minatec Finance S.A.R.L.*, No. 1:08-CV-269, 2008 U.S. Dist. LEXIS 63802, at *25 (N.D.N.Y. Aug. 18, 2008). Courts must carefully consider whether there is "reliable evidence that the foreign tribunal would not make any use of the requested material." *In re Application of Babcock Borsig AG*, 583 F. Supp. 2d 233, 241 (D. Mass. 2008). In such a circumstance, "it may be irresponsible for a district court to order discovery." *Id.* This is indeed such a circumstance.

As a general matter, it is well-tread ground that "[t]he approach to discovery and evidence in Latin American legal systems is strikingly different than that in the U.S. system." E.E. Daschbach, *Where There's a Will, There's a Way: The Cause for a Cure and Remedial and Remedial Prescriptions for Forum Non Conveniens as Applied in Latin American Plaintiffs' Actions Against U.S. Multinationals*, 13 L. & Bus. Rev. Am. 11, 32 (2007). "In Latin American legal systems, there are generally no depositions, and document discovery is exceedingly limited." *Id*; *see also* Stephen N. Subrin, *Discovery in Global Perspective: Are We Nuts?*, 52 DePaul L. Rev. 299, 302 (2002) (noting in some civil law systems "'a party may be compelled to produce a document [only] when the judge concludes that the document is the only evidence concerning the point in issue'" (citation omitted)); James H. Carter, *Existing Rules and Procedures*, 13 Int'l L. 5, 5 (1979) (noting U.S. discovery laws are "so completely alien to the procedure in most other jurisdictions"). The axiom that discovery is far more restrictive in Latin American civil law countries than in the United States applies *a fortiori* to expert discovery,

14

which is conducted entirely at the direction of and under the close supervision of the court presiding over the matter.  *See, e.g.,* Alejandro M. Garro, *Forum Non Conveniens: "Availability" and "Adequacy" of Latin American Fora From a Comparative Perspective*, 35 U. Miami Inter-Am. L. Rev. 65, 94 (2003) ("Under the prevailing pattern in Latin America, experts speak for the benefit of the court and not the parties . . . . It is . . . for the court to determine the issues on which the experts will report.").

Indeed, the foregoing generalizations concerning the limited scope of discovery in Latin American civil law countries hold especially true as applied to Ecuador.  As noted by Professor Daniela Salazar Marín – a Professor of Law at the Universidad San Francisco de Quito in Quito, Ecuador specializing in comparative law who received her LLM from Columbia University, (Moll Decl., Ex. O)   – "[t]here are important differences between the process of gathering evidence in Ecuador and the process of gathering evidence in the United States, the former being surrounded by many more formalities."  (Moll Decl., Ex. P, at ¶ 12.)  It is clear that the free-wheeling, party-initiated nature of discovery common in the United States would appear shocking – indeed, offensive – to the sensibilities of the Ecuadorian court system, which is defined by its rigid strictures on both the scope and timing of discovery, and by the fact that taking and submission of evidence does not occur absent the blessing of the court.  (See Moll Decl., Ex. P, at ¶¶ 13-21.)

Professor Salazar goes on to emphasize that the Ecuadorian courts exercise even tighter control over the taking of expert discovery.  (See Moll Decl., Ex. P ¶¶ 13-26.)  Significantly, parties have no right to initiate discovery against an adversary's expert.  "The concept of deposing a person who has been identified as an expert by one of the parties and whose opinions

may be presented at trial is foreign to Ecuadorian procedural laws. Also, the practice of deposing another parties' expert before the trial and without the approval of the judge is foreign to Ecuadorian courts."   (Moll Decl., Ex. P, at ¶ 29(ii); see also Moll Decl., Ex. Q, at ¶¶ 7-9.) Moreover, in addition to lacking a mechanism that would allow one party to depose another party's expert, no corollary to Fed. R. Civ. P. 26 can be found in Ecuadorian law such that would allow a party to demand the *documents* of his adversary's expert: "Ecuadorian laws do not entitle the parties to demand the drafts of the expert's report. Without a court order, a party could not demand an expert to disclose the data or other information considered during the making of his or her report." (Moll Decl., Ex. P, at ¶ 29(iii); *see also* Moll Decl., Ex. Q, at ¶¶ 7-9.)   Ecuador has its own limited mechanisms for challenging an expert's findings – but demanding the expert's documents and subjecting him to a deposition are not among them.  (Moll Decl., Ex. P, at ¶ 29(iv); *see also* Moll Decl., Ex. Q at ¶ 7.)

Chevron cannot credibly argue it would be entitled to depose Mr. Shefftz as of right, or compel him to produce drafts and other documents as of right, if he were located in Ecuador. Not one of the many experts who have participated in the Lago Agrio litigation has been subjected to anything remotely resembling an American-style deposition, nor has any party expert been compelled to produce such documents at the whim of the adverse party.  The fact is, respect for the Ecuadorian courts and obtaining Section 1782 discovery are not necessarily mutually exclusive here – Chevron very well could have sought, in conformity with Ecuadorian procedure,  the Lago Agrio court's blessing before embarking on a discovery expedition in the United States that is now a direct affront to the Lago Agrio Court's jurisdiction.

But as it is, Chevron has chosen to bypass the norms of the foreign court – the very same foreign court that Chevron fought for eight years to move this case to.  Section 1782 is intended to aid litigants in taking discovery that they cannot take in a foreign jurisdiction because that discovery is located here, not because the discovery mechanism is anathema to the policies underlying the foreign nation's proof-gathering framework.  Because the instant Application is such a blatant attempt to evade Ecuador's proof-gathering restrictions, it should be denied.

**B.      Although Chevron Argues Here that the Lago Agrio Court Will be Receptive to the Discovery Sought, Chevron Has In Fact Admitted to the Arbitration Panel  that the Lago Agrio Court is Not Interested in Further Evidence From Chevron on the Issue of Damages**

Section 1782 states that a district court *may* order a person to give testimony or to produce documents for use in a foreign or international tribunal.  28 U.S.C. § 1782 (emphasis added).  Indeed, a district court has wide discretion to grant or withhold discovery pursuant to 28 U.S.C. § 1782.  *Intel*, 542 U.S. at 256.  One of the discretionary factors to be considered by courts is "the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government *or the court* or agency abroad to U.S. federal-court assistance."  *Id*. at 264 (emphasis added).  The Supreme Court has noted that the purpose of § 1782 is "to assist foreign tribunals in obtaining relevant information that the tribunals may find useful but, for reasons *having no bearing on international comity*, they cannot obtain under their own laws…."  *Intel*, 542 U.S. at 262 (emphasis added).  Thus, it is axiomatic that a district court's determination of whether to compel discovery "is to be guided by the nature, attitude, and procedures of the foreign jurisdiction."  *In re Application of Michael Wilson & Partners, Ltd.*, No. 06-CV-02575, 2007 WL 2221438, at *3 (D. Colo. July 27, 2007) (citing *Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 84 (2d Cir. 2004)).

Chevron has represented to this Court that "[w]hile the Ecuadorian court has not expressly made any statements on the record concerning receptivity, it has accepted for filing evidence obtained by Chevron under §1782," stating in each instance that the evidence "will be taken into account at the appropriate point in the proceedings."  (Dkt. 1-1, at 12-13.)  But in its September 16, 2010 opening arguments submitted to the arbitration panel, **Chevron admitted "the [Lago Agrio] court has not shown *any* interest in the concrete evidence of the Plaintiffs' malfeasance,"** even after the company "**presented the *Crude* evidence," "more than 100 separate complaints by Chevron regarding Cabrera's impartiality . . . and even the most recent evidence of his [alleged] fraud."**  (Dkt. 1-10, at ¶ 241, 245 (emphasis added).) The bottom line – Chevron is all too willing to change its spin on what is transpiring in Ecuador to suit whatever argument it needs to make to a given audience.

And as for Chevron's reliance on the fact that the Lago Agrio Court continues to "accept for filing" Chevron's never-ending litany of complaint-laden submissions: under Ecuadorian law, the Lago Agrio Court is required to undertake the formality of accepting every filing into the record – this does not mean that the Lago Agrio Court is receptive to this evidence or will actually consider Chevron's duplicative, harassing petitions in any way.  In fact, when it accepted the parties' September 16 submissions on damages, the Lago Agrio Court noted that "[t]he other documents submitted by the parties and unrelated to the content of this order will not be examined, because they would be irrelevant under procedural law, *but will be merely added to the file* because the judge is required to be guided by ethics in his judgments and comply with the provisions of Art.169 of the Constitution.. . . ."  (Moll Decl., Ex. K.)  It is clear that the Lago Agrio Court's prohibition on further submissions was made necessary by Chevron's abusive

practice of quite literally drowning the Lago Agrio Court in motions (on occasion, filing upwards of twenty motions in an hour) – a practice designed to frustrate the progress of the litigation and which ultimately led to the recusal of a judge who apparently could not or would not keep up with Chevron's filings. (Moll Decl., Ex. R, at 2-3; *see also* Moll. Decl., Ex. S.)  Indeed, two of Chevron's Ecuadorian lawyers were recently sanctioned for attempting to obstruct the trial through this abusive motion practice:  on one day Chevron attorneys Alberto Racines and Diego Larrea filed nineteen motions in a thirty-minute period.  (*See* Moll. Decl., Ex. S.)

If Chevron's own admission concerning the Lago Agrio Court's lack of receptivity toward additional discovery were not enough, certainly, the Lago Agrio Court's attitude toward this specific discovery sought in this proceeding is embodied unmistakably in the August 2, 2010 Order issued by the Lago Agrio Court.  (*See generally* Moll Decl., Ex. K.)  Chevron's claim that it must take discovery of Mr. Shefftz in order to respond to Plaintiffs' September 16 submission is simply false – the parties have been afforded their opportunity to comment on the issue of damages, and are not entitled to put in any kind of response to each other's submissions.

For this Court to allow Chevron to undertake additional discovery relating to the opinions and communications of Mr. Shefftz would ignore the Ecuadorian court's express unwillingness to consider additional materials submitted by Chevron.  "[A] decision by this Court upholding [Chevron's] discovery request would contravene the purpose of § 1782 by pitting this Court against the [Lago Agrio Court], rather than fostering cooperation between them, and would violate established principles of comity, under which 'United States courts ordinarily refuse to review acts of foreign governments and defer to proceedings taking place in foreign countries.'" *In re Microsoft*, 428 F. Supp. 2d 188, 195-96 (S.D.N.Y. 2006) (citation omitted); *see also In re*

*Application of Microsoft Corp.*, No. 06-10061-MLW, 2006 WL 1344091, at *4 (D. Mass. Apr. 17, 2006) ("[T]he Supreme Court has recognized that a primary purpose of § 1782(a) is to aid foreign tribunals. . . .   It is now evident that granting Microsoft the discovery it requests from Novell would interfere with the foreign tribunal, not assist it.").   The Court should deny Chevron's application on the basis that the Ecuadorian courts do not desire the discovery sought – indeed, a grant of additional discovery to a party that will use it to further bury the foreign court in abusive motions is an affront to that court, and contravenes the very purpose of § 1782.

### C.     Chevron's Application Is an Intrusive and Burdensome Fishing Expedition That This Court Must Deny

This Court should also consider whether the discovery sought by Chevron is too unduly intrusive or burdensome to warrant invocation of § 1782.  *Intel*, 542 U.S. at 264-65.   Courts examining this factor have consistently denied applications to take discovery where litigants have sought "unbridled and unlimited discovery."  *Bayer AG v. Betachem, Inc.*, 173 F.3d 188 (3d Cir. 1999); *see also In Re Application of Blue Oil Trading Ltd.*, No. 3:09-MC-152, 2009 U.S. Dist. LEXIS 97224 (W.D.N.C. Oct. 5, 2009) (denying application for § 1782 discovery where requests were unlimited in time and general in nature).  Foreign litigants are "not permitted to use this Court's discovery procedures to undertake a fishing expedition." *Kulzer v. Biomet Inc.*, No. 3:09-MC-275, 2009 U.S. Dist. LEXIS 101283, at *31 (N.D. Ind. Oct. 29, 2009); *see also Smoothline Ltd. v. N. Am. Foreign Trading Corp.*, No. 00-CIV-2298, 2000 U.S. Dist. LEXIS 10225, at *15 (S.D.N.Y. July 21, 2000) (denying petition to compel discovery where the discovery request was a "'fishing expedition' [and] a vehicle for harassment." (citation omitted)).

Moreover, not only are courts required to guard against unduly intrusive or burdensome discovery requests under § 1782, but courts also must make sure that the statute is not being used

to create an imbalance between parties to a foreign litigation.  *Edelman v. Tattinger*, 295 F.3d 171, 181 (2d Cir. 2001).  In *Edelman*, the Second Circuit cautioned against the over-application of § 1782, warning that the statute should not be utilized in a way "that will create obvious confusion or skew the results in the foreign litigation."  *Id.*; *see also* S. Rep. No. 88-1580, reprinted in 1964 U.S.C.C.A.N. at 3783 (explaining that § 1782(a) is to provide *equitable* procedures for the benefit of litigants in international litigation).  For the Second Circuit, the risk of confusion and imbalance was high where a foreign litigant already obtained significant U.S. discovery under § 1782.  *Id*.

Here, Chevron contends that it is "plainly" entitled to discovery under § 1782 to determine whether Mr. Shefftz may be linked somehow to a purported fraud involving the Cabrera Report.  What is plain is that Chevron possesses no facts linking Mr. Shefftz to any purported fraud.  The purpose and motivation underlying Mr. Shefftz's report is in no way mysterious or fraudulent:  Mr. Shefftz "was retained on behalf of plaintiffs' counsel in the [Lago Agrio] litigation to assist in developing an independent evaluation and estimate of the potential costs for the remediation of environmental damages in the Concession area in the Oriente region of Ecuador." (Dkt. 3-19, at 1.)  The bases for and sources used in Mr. Shefftz's analysis are called out explicitly in his report – Mr. Shefftz discloses his review and reliance on much of the scientific evidence, including the Cabrera Report, in the record in the Lago Agrio Litigation. (*See generally id.*)

In reality, Chevron seeks this discovery to harass Mr. Shefftz and sap the Plaintiffs in the Lago Agrio Litigation of their limited resources, as evidenced by Chevron's filing of six § 1782 applications in one day in different jurisdictions across the United States – the latest chapter in its

unending § 1782 campaign.  Chevron hopes that this Court will confuse Chevron's successes in obtaining discovery regarding the purportedly fraudulent Cabrera Report with an entitlement to obtain unlimited discovery from the Plaintiffs concerning entirely separate matters, including Mr. Shefftz's September 16 report.  To be blunt, Chevron is using its unlimited resources to unreasonably force Plaintiffs to incur costs and expenses related to frivolous discovery and to litigate the case fully in the United States in direct contravention of the aims of § 1782.  The United States' broad discovery rules are intended to be the great equalizer, but here, they are being used to exacerbate the inherent imbalance between a corporate giant and a group of residents of the Ecuadorian Amazon rainforest who do not have the luxury of filing § 1782 actions in every jurisdiction where one of Chevron's many U.S.-based experts reside.  If any semblance of parity between the parties to the Lago Agrio litigation is to be maintained, Chevron's § 1782 campaign – after seventeen (17) separate actions, eleven (11) depositions, and approximately 275,000 pages of discovery – must finally be halted.  Absent intervention from this Court, it is abundantly clear that this campaign will continue indefinitely.

## II.     CHEVRON'S REQUEST FOR DISCOVERY FROM MR. SHEFFTZ IN AID OF THE PRIVATE ARBITRATION IS INAPPROPRIATE AND SHOULD BE DENIED

### A.     Chevron's Application as to the Private Arbitration Fails Because the Arbitration Panel Is Not a "Foreign or International Tribunal"

Section 1782 provides, in pertinent part, that a "district court . . . may order . . . [discovery] *for use in a proceeding in a foreign or international tribunal*."  28 U.S.C. § 1782(a) (emphasis added).  Thus, as a statutory prerequisite to granting Section 1782 discovery, a court must first find that the discovery is in aid of a "foreign . . . tribunal."  *See id.*  To the extent Chevron's Application contends that private arbitration panels – like the one at issue here –

constitute "foreign or international tribunal[s]" for purposes of discovery under Section 1782(a), this argument fails as a matter of law.

Neither the U.S. Supreme Court nor the Court of Appeals for the First Circuit has yet addressed whether a private arbitration qualifies as a "foreign or international tribunal" under Section 1782(a). The only two Circuit Courts of Appeal to have addressed this issue have held that private international arbitrations simply cannot be regarded as "foreign tribunals" for purposes of Section 1782 discovery. *See Nat'l Broadcasting Co., Inc. v. Bear Stearns & Co., Inc.*, 165 F.3d 184 (2d Cir. 1999); *Republic of Kazakhstan v. Beidermann*, 168 F.3d 880 (5th Cir. 1999). In *National Broadcasting Co.*, the Second Circuit held that a commercial arbitration in Mexico, which applied the rules of the International Chamber of Commerce, was not within the scope of Section 1782, as "Congress did not intend for that statute to apply to an arbitral body established by private parties." *Nat'l Broadcasting Co.*, 165 F.3d at 19l. Section 1782's reference to a "foreign or international tribunal," according to the *National Broadcasting* panel, contemplates a "state-sponsored" proceeding; thus, private arbitration falls outside Section 1782's coverage. *Id.* at 188 (noting that Section 1782's "legislative history's silence with respect to private tribunals is especially telling because . . . a significant congressional expansion of American judicial assistance to international arbitral panels created exclusively by private parties would not have been lightly undertaken by Congress without at least a mention of this legislative intention"). In *Beidermann*, the Fifth Circuit reached a similar holding in finding that a private international arbitration could not be regarded as a foreign tribunal – and that any discovery in aid of the arbitration would countermand the policy rationales behind arbitration and, indeed, the legislative purpose of Section 1782. *See Beidermann*, 168 F.3d at 881-83 (extensive discovery

through the federal courts pursuant to Section 1782 would complicate and undermine private international arbitration, which is intended as a "speedy, economical, and effective means of dispute resolution").

District courts have continued to follow the Second and Fifth Circuits' approaches in recognizing that private arbitration panels cannot qualify as "foreign or international tribunals" within the meaning of statute.[8] *See, e.g.*, *In re Opera-dora DB Mexico, S .A. DEC*, No. 6:09-CV 383-ORL-22GJK, 2009 WL 2423138, at *12 (M.D. Fla. Aug. 4, 2009) (International Chamber of Commerce International Court of Arbitration is not a foreign or international tribunal under § 1782); *In re Arbitration in London*, No. 09 CV 3092, 2009 WL 1664936, at *4 (N.D. Ill. June l5, 2009) (discussing *Intel* and holding: "I generally agree with the conclusion of the Second and Fifth Circuits that the legislative history of § 1782 does not support the inclusion of private arbitral tribunals within the scope of § 1782(a)."); *In La Comision Ejecutiva, Hidroelectrica Del Rio Lempa v. EI Paso Corp.*, 617 F. Supp. 2d 481, 487 (S.D. Tex. 2008) (finding that private arbitral panel was not "foreign or international tribunal" under § 1782).  In fact, the Fifth Circuit – which revisited its *Beiedermann* decision last year in the face of *Intel* – declined to broaden its interpretation of "foreign tribunal" to include international arbitration panels, finding *Intel* irrelevant to that issue.  *EI Paso Corp. v. La Comision Ejecutiva, Hidroelectrica Del Rio Lempa*,

---

[8] Although *Intel* itself dealt with a Section 1782 application in aid of an antitrust proceeding before the Commission of European Communities and did not address private international arbitrations, *Intel*, 542 U.S. at 246, the Court's opinion quoted a law review article which suggests that arbitral panels may qualify as "foreign tribunals." *Intel*, 542 U.S. at 258 (quoting Han Smit, *International Litigation Under the United States Code*, 65 Colum. L. Rev. 1015, 1026-27 & nn. 71, 73 (1965)). A few district courts have seized on this language (*dicta*, at best) to conclude that the Supreme Court was adopting the law review article's definition of "tribunal" *in toto*. *See, e.g.*, *In re Application of Babcock Borsig AG*, 583 F. Supp. 2d 233 (D. Mass. 2008).  However, the First Circuit Court of Appeals has not reviewed this issue – and *not a single* U.S. Court of Appeals circuit has held that a private arbitration can be considered a 'foreign tribunal."

24

No. 08-20771, 2009 WL 2407189, at *3 (5th Cir. Aug. 6, 2009).  Accordingly, the weight of decisional law supports a finding that a private international arbitration is not a foreign tribunal for purposes of Section 1782.

Private arbitration is a method of resolving disputes in a neutral and impartial forum where parties voluntarily agree to the terms and rules of dispute resolution.  *Nat'l Broadcasting Co.*, 165 F.3d at 190-91; *see also Porzig v. Dresdner, Kleinwort, Benson, North America LLC*, 497 F.3d 133, 138 (2d Cir. 2007) ("The value of arbitration lies in its efficiency and cost-effectiveness as a process for resolving disputes outside the courts, and its tendency to foster a less acrimonious process.").  Private arbitrations, as creatures of contract, enable parties to freely choose substantive, procedural, and evidentiary matters in advance.  *See, e.g., Beidermann*, 168 F.3d at 883; *see also In re Application of Caratube Int'l Oil Co., LLP*, 2010 WL 3155822, at *4 ("Pursuant to a bilateral investment treaty between Kazakhstan and the United States, Caratube had the option of arbitrating this dispute in 'any other arbitration institution, or in accordance with any other arbitration rules, as may be mutually agreed between the parties to the dispute.'" (internal citations omitted)).  An international private arbitral, where international disputes are at stake, afford parties this same degree of control.[9]  *Nat'l Broadcasting Co.*, 165 F.3d at 189 ("If the parties to a private international arbitration make no provision for some degree of consensual discovery inter se in their agreement to arbitrate, the arbitrators control discovery, and neither

---

[9] It is of no consequence that the Republic of Ecuador, a sovereign, is one of the parties in the Republic of Ecuador-Chevron private international arbitration, and its presence does not transform the private arbitral body into a public international tribunal.  *See, e.g., In re Application of Caratube Int'l Oil Co., LLP*, 2010 WL 3155822, at *4-5 (recognizing a valid international private arbitration between Caratube International Oil Company and the Republic of Kazakhstan).

party is deprived of its bargained-for efficient process by the other party's tactical use of discovery devices.").

It cannot be disputed that The Arbitral Tribunal established to conduct the private arbitration is a private arbitration between Chevron and the Republic of Ecuador operating under the United Nations Commission on International Trade Law ("UNCITRAL") Rules, as agreed upon by both parties. UNCITRAL Arbitration Rules are "a comprehensive set of procedural rules *upon which parties may agree for the conduct of arbitral proceedings arising out of their commercial relationship.*" (Moll Decl., Ex. F) (emphasis added).) That does not, however, mean that the arbitration is any way affiliated with the United Nations. Although Chevron frames its Application in such a way as to suggest that there is some formal, official foreign court sitting in judgment of its arbitration claim – *e.g.*, Chevron repeatedly refers to the arbitral panel as "[t]he Permanent Court of Arbitration in the Hague Operating under the Arbitration Rules of the United Nations," (Dkt. 1-1, at 9) – this is misleading in both fact and law. In reality, the arbitrators on the Republic of Ecuador-Chevron Tribunal are *not* sitting judges (the Permanent Court of Arbitration has no sitting judges): as with other private arbitrations, the parties themselves select the arbitrators. (Moll Decl., Ex. T.) Nor are the proceedings public – the proceedings, as with other private arbitrations, are "held in private and confidential." *Id*. Just as private companies employ external principles like *Robert's Rules of Order* to govern private shareholder meetings, private parties can elect to utilize UNCITRAL Arbitration Rules to conduct international arbitration. Application of UNCITRAL Arbitration Rules does not alone convert an otherwise private arbitration tribunals into a "public investment arbitration," as Chevron has argued in related proceedings. (*See* Moll Decl., Ex AA at 15). In short, the

pending Republic of Ecuador-Chevron international arbitration should be regarded as a private arbitration between two parties seeking to resolve commercial and other arbitral claims in a forum Chevron voluntarily selected.  And the parties have not decided to pursue discovery.

> **B.**   **The International Arbitration Is Not Receptive to the Kind of Discovery Sought from Mr. Shefftz and Chevron's Application for Discovery in Aid of the Arbitration Is Not Congruent with the Company's Strategic Choice to Engage in Arbitration in the First Instance**

Chevron seeks from Mr. Shefftz discovery in a form and of a nature that international arbitration the forum Chevron chose to bring its claims against the Republic of Ecuador, does not permit or contemplate.  In determining whether to exercise its discretion to grant an application for discovery under 28 U.S.C. § 1782, the reviewing court must consider the nature of the non-U.S. tribunal, the character of the proceeding abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal court assistance.  *See Intel*, 542 U.S. at 264-65; *In re Microsoft Corp.*, 428 F. Supp. at 194.  In addition, the reviewing court must also determine whether the § 1782 application conceals an attempt to circumvent foreign proof-gathering restrictions.  *See Intel*, 542 U.S. at 264-65; *In re Microsoft Corp.*, 428 F. Supp. 2d at 194.

> **1.**   *Chevron Cites No Affirmative Authority for the Proposition That the International Arbitration Would Authorize the Discovery It Now Seeks*

Chevron's briefing is unsurprisingly devoid of any *affirmative* argument as to why an international arbitration *would* authorize the kind of discovery the company now seeks from Mr. Shefftz, it does not explain or whether discovery *would* be consistent with the character of the proceedings of the international arbitration and the goals of arbitration generally, or whether any UNCITRAL-rule-applying arbitral panel has ever requested (or even admitted) the deposition

testimony of an expert witness who did not appear or submit work product for the consideration of the arbitral panel.  Instead, the company cites only to negative authority, ("[N]o court has found . . . ."), and a District of New Jersey case presently on appeal (for the very proposition Chevron now relies on) to the United States Court of Appeals for the Third Circuit *and not related to the September 16, 2010 supplemental damages submission*.

> **2.    *The Kind of Discovery Sought from Mr. Shefftz Is Either Prohibited or Strongly Disfavored in the International Arbitration Process***

It is, in fact, beyond factual dispute that discovery in international arbitrations is *extremely* limited (if permitted at all).  In circumstances where depositions or other discovery is permitted in international arbitration, it is almost always limited to an exchange of very specifically identified documents, and as a general matter does not include *any* depositions, let alone the deposition of a "testifying expert," as Chevron refers to Mr. Shefftz in its *Ex Parte* Application.  *See* Eric Ordway, *International Arbitration, The Benefits and the Drawbacks*, Aspatore (2007) (unpaginated), available at 2007 WL 6082200; *see also* Nathan D. O'Malley and Shawn C. Conway, *Document Discovery in International Arbitration—Getting the Documents You Need*, 18 Transnat'l Law. 371, 371 (2005) (emphasizing that "[i]n international arbitration . . . discovery is not allowed on a level comparable to what is standard within the American legal practice, if allowed at all.  To a very limited degree, international arbitral tribunals may order document production, but depositions, even of party witnesses, are almost never allowed"); Lucille M. Ponte & Erika M. Brown, *Resolving Information Technology Disputes After NAFTA: A Practical Comparison of Domestic and International Arbitration*, 7 Tul. J. Int'l & Comp. L. 43, 57 (1999) (observing that arbitrators in international arbitrations are unlikely to require parties to respond to interrogatories and depositions); George M. von Mehren,

*A Brief Overview of International Arbitration*, Aspatore (2007) (unpaginated) (noting that the "convention in international arbitration is to have document discovery that is far more limited than what is typical in U.S. court litigation" and that "depositions are rare"), *available* at 2007 WL 6082203.

Unlike the Federal Rules of Civil Procedure, which provide detailed rules regarding the taking of depositions of parties, non-party witnesses, and experts, the rules of UNCITRAL, which govern the international arbitration, do not provide for or contemplate the taking of depositions in international arbitrations.   Moreover, the International Bar Association ("IBA") Rules of Evidence, which is the document representing "the growing consensus of how evidential matters are to be handled in cross-cultural arbitrations," is silent with respect to depositions and interrogatories.   *See* Helmer, *supra*, at 51-52 ("By the mere fact of omission of [these] U.S. discovery practices, [the IBA] *withdraws its "blessings" from those practices* in order to preserve specificity of international arbitration . . . keep it speedier, and control costs." (emphasis added)).

### C.   Chevron Has No Right to Depose, in Aid of an International Arbitration, a Testifying Expert in a Separate and Distinct Civil Litigation – Particularly an Expert Whose Role Is Clearly Irrelevant to the Arbitration

Although Chevron's attempt to characterize Mr. Shefftz as a testifying expert for purposes of justifying the broad discovery it seeks from him fails on multiple levels, perhaps the most fundamental hole in Chevron's reasoning is as follows:  The Plaintiffs, as non-parties to the international arbitration, have not submitted Mr. Shefftz's "testimony" in that proceeding.  If the Rule 26 entitlement to depose and take written discovery from an expert is grounded in the notion that an adversary should be entitled to thoroughly ascertain the basis for the expert

testimony being wielded against it, Chevron's invocation of Rule 26 in aid of the arbitration breaks down right there.  If Mr. Shefftz's submission is to find its way in front of the arbitration panel, it will be because *Chevron* brought it there – Chevron's invocation of Rule 26(a) is wholly inapposite as applied to its argument that this discovery may be taken in aid of the international arbitration.

Moreover, Mr. Shefftz's role in the Lago Agrio litigation is in no way related to the issues under consideration in the arbitration.   The essence of Chevron's claims in the arbitration is that the "[Republic of] Ecuador has engaged in a pattern of improper and fundamentally unfair conduct" whereby the Republic has allegedly (i) repudiated various settlement and release agreements; (ii) improperly exercised jurisdiction over Chevron; (iii) utilized the Lago Agrio trial as a means of imposing cleanup obligations that belong to the State on Chevron; and (iv) abusing the criminal justice system to advance its "improper goals." (Dkt. 1-9, at ¶¶ 68-69.)  In sum, the international arbitration is exclusively premised on the Republic of Ecuador's alleged unfair treatment of Chevron.[10]   A reading of Chevron's recently filed Memorial on the Merits only further supports this view, as all references to the September 16, 2010 supplemental damages submission are couched in arguments regarding the Lago Agrio court's attempt "to Restrict Chevron's Due Process Rights" by allowing the new damages submissions.  (*See* Dkt. 1-10, ¶ 243-44.)

---

[10] In past § 1782 proceedings, Chevron has apparently been able to articulate to the satisfaction of courts how discovery concerning the Cabrera Report could conceivably be relevant to Chevron's efforts to prove that it is being treated unfairly by the Republic of Ecuador in alleged violation of the U.S.-Ecuador Bilateral Investment Treaty.  But Mr. Cabrera was a court-appointed, independent expert, an auxiliary of the court itself.  Mr. Shefftz, in contrast, cannot be cast in any reasonable way as an extension of the Republic – he is the Plaintiffs' privately-hired expert.

Even assuming *arguendo* that Mr. Shefftz is indeed "out to get" Chevron and has concocted a bogus submission on damages to achieve that goal, such a fact would still be utterly useless as applied to an international arbitration that is centered on the Ecuadorian government's alleged vendetta against Chevron.[11]

## III.   CHEVRON IS NOT ENTITLED TO ISSUE PRECLUSION AS A MATTER OF BOTH LAW AND FAIRNESS

Chevron's argument that issue preclusion should bar the Plaintiffs from arguing issues previously ruled upon by other courts in other 28 U.S.C. § 1782 actions – actions that do not in any way relate to the supplemental damages submission or Mr. Shefftz's work – is baseless. *See Comm'r v. Sunnen*, 333 U.S. 591, 599-600 (1948) ("[Issue preclusion] must be confined to situations where the matter raised in the second suit *is identical in all respects* with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged." (emphasis added)).   The argument itself is an effort by Chevron to cherry-pick favorable quotes from past rulings to avoid arguing the merits of its present discovery request based on an unrelated and dissimilar set of facts and legal issues.   As demonstrated above, as a stand-alone matter, the instant *Ex Parte* Application does not pass muster.

Mr. Shefftz has *never* been party to the seventeen § 1782 actions initiated by Chevron. *See Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 329 (1971) (holding "litigants . . . who never appeared in a prior action[ ] may not be collaterally estopped").   With regard to the *Intel* factors, § 1782 discovery requires each court to apply its own discretion, based

---

[11] Chevron will likely argue that its discovery requests are justified because, just maybe, Mr. Shefftz is conspiring with the Republic of Ecuador – but wild speculation should not prevail here.   Common sense *should* – and common sense suggests that Mr. Shefftz's limited work for the Plaintiffs is not related to the arbitration between Chevron and the Republic of Ecuador.

on the facts presented, as to whether to the discovery would aid the litigation.  *See In re Metallgesellschaft AG*, 121 F.3d 77, 79 (2d Cir. 1997).  Chevron cannot cite even a single case applying issue preclusion to bar arguments in opposition to a 28 U.S.C. § 1782 discovery application.

The current *ex parte* § 1782 Application pending against Mr. Shefftz is wholly dissimilar from all of Chevron's previous Applications for discovery.  Chevron's previous § 1782 Applications sought discovery related to an alleged "secret collaboration" between the Plaintiffs and a court expert, Mr. Richard Cabrera, who prepared a global report on damages in the Lago Agrio Litigation.  Chevron has argued to § 1782 courts that Mr. Cabrera was independent and neutral as the court-appointed expert, and therefore the Plaintiffs improperly submitted proposed findings of fact to Mr. Cabrera.[12]

It is immediately clear that Mr. Shefftz's work is unrelated to the Cabrera Report (prepared more than two years ago).  Mr. Shefftz was not appointed by the Lago Agrio Court and

---

[12] The Plaintiffs continue to challenge the premise that it was improper to submit materials to Mr. Cabrera.  The Lago Agrio Court specifically invited the Plaintiffs to submit materials, *see* Moll Decl., Ex. V, at 9 ("*[T]he parties may submit to the expert whatever documentation they believe may be useful in preparing his report*.  As this information is not evidence since it was not requested during the evidentiary period, it was order to be delivered directly to the expert, its recipient." (emphasis added)), and the Plaintiffs have disclosed the fact that proposed findings of fact and scientific data were shared with Mr. Cabrera.  (*See* Moll Decl., Ex. J, at 5-6 (brief by Plaintiffs to Lago Agrio Court noting the Plaintiffs "took advantage of the opportunity to advocate their own findings, conclusions, and valuations before Cabrera").  This position is further strengthened by the indisputable fact that Chevron has presented to the Lago Agrio Court evidence of these allegedly improper interactions and the fruits of its discovery from other § 1782 actions (including the *Crude* outtakes) and the Lago Agrio Court has *repeatedly* refused to hold that the interactions with Mr. Cabrera were in any way improper.  (*See* Moll Decl., Ex Z, at 3-4 (brief by Chevron, filed in May 2010 in Lago Agrio Court, presenting evidence of "collaboration" between Mr. Cabrera and Plaintiffs and discussing *Crude* outtakes and other fruits of § 1782 discovery).)

there is no allegation that the Plaintiffs acted improperly by interacting directly with him.  There is simply no allegation that anything Mr. Shefftz did was improper.

Chevron's Application as to Mr. Shefftz is instead what can only be regarded as a case of first impression:  the *first* attempt by *any litigant* in the history of § 1782 jurisprudence to seek "testifying expert discovery" in aid of a foreign litigation – an abuse of the § 1782 process. Chevron's application for discovery from Mr. Shefftz presents an entirely unique set of facts and legal issues – concerning an entirely different document submitted for an entirely different purpose and the subject of an entirely different series of orders by the Lago Agrio Court. Ironically, under Chevron's reasoning, the company itself should be collaterally estopped from presenting an issue preclusion argument in the first instance.  Chevron has repeatedly argued – unsuccessfully – in at least five § 1782 jurisdictions that issue preclusion should prevent the Plaintiffs from advancing certain arguments.  Not a *single* jurisdiction has found that the Plaintiffs are estopped from making any argument – let alone even entertained Chevron's assertion.  (*See* Moll Decl., Ex. W, at 8 (S.D. Cal. Brief arguing collateral estoppel); Moll Decl., Ex.X, at 17 (D.N.M. brief arguing same); Moll Decl., Ex. Y, at 19 (S.D.N.Y. brief arguing same); Moll Decl., Ex. AA, at 16 (W.D.N.C. brief arguing same); Moll Decl., Ex. BB, at 2 (M.D. Tenn. brief arguing same).)

Because Chevron bears the burden of establishing that collateral estoppel applies, *see Rzasa v. Bugnacki (In re Bugnacki)*, No. 08-30755, 2010 Bankr. LEXIS 3074, at *28 (2d Cir. Aug. 31, 2010), because Mr. Shefftz was not even a party to any of the other § 1782 applications, because the facts in the instant application relate to the September 16, 2010 Supplemental Damages Submission and are entirely divorced from the issues related to the 2008 Cabrera

33

Report, and because Chevron was not granted in prior cases much of the same relief it now seeks here, this Court cannot apply collateral estoppel.

**IV.     ASSUMING THAT CHEVRON IS ENTITLED TO *ANY* DISCOVERY EITHER IN AID OF THE LAGO AGRIO LITIGATION, THE ARBITRATION, OR BOTH, CHEVRON IS MOST CERTAINLY NOT ENTITLED TO EVERYTHING THAT IT SEEKS BY WAY OF ITS OVERBROAD PROPOSED SUBPOENA**

      **A.     Even If the Court Finds that Chevron is Entitled to Discovery Under the Theory that Respondent is a Testifying Expert in the Lago Agrio Litigation, the Proposed Subpoena Must be Limited**

            ***1.     The Court Should Apply the Newly Amended Version of Fed. R. Civ. P. 26 to Limit the Disclosure of Draft Expert Materials and Attorney-Expert Communications***

The Supreme Court has ordered courts to apply amended Federal Rule of Civil Procedure 26 to all proceedings *pending* on December 1, 2010, so long as that application is "just and practicable."   *See* (Moll Decl., Ex. YY) (submitting to Congress proposed 2010 rule amendments, which shall "take effect on December 1, 2010, and shall govern in proceedings thereafter commenced and, insofar as just and practicable all proceedings then pending"). Where, as here, application of amended Rule 26 to the present matter will be fair as to all parties and easily implemented, this Court should apply revised Rule 26.

The change in the Rule is significant and would substantially curtail, if not eviscerate, Chevron's discovery demands:  the "new" Rule 26 shields draft expert materials and most attorney-expert communications from discovery.   *See* Fed. R. Civ. P. 26(b)(4)(B)-(C) (amendment effective Dec. 1, 2010).  "The proposed changes were made in light of experience showing that the benefits of full disclosure [of expert materials] d[id] not outweigh the costs." *Galvin v. Pepe*, No. 09-cv-104-PB, 2010 WL 3092640, at *6 (D.N.H. Aug. 5, 2010); *see also*

Advisory Comm. Notes to Proposed 2010 Amendments to Rule 26 ("[R]outine discovery into attorney-expert communications and draft reports has had undesirable effects[,]" such as higher costs and less effective attorney-expert interactions).  The revised Rule 26 rejects the notion that all documents considered by a testifying expert in forming his or her opinion, including attorney work product, are discoverable.  *See* Advisory Comm. Notes to Proposed 2010 Amendments to Rule 26 ("[A]mendment is intended to alter the outcome in cases that have relied on the 1993 formulation in requiring disclosure of all attorney-expert communications and draft reports.").

At the outset, by stipulation of the parties, the Plaintiffs (if so ordered) would produce documents on December 1, 2010 – the date the new rule takes effect.  (Dkt. 17-1, at 2.)  The application of amended Rule 26 will be especially "just," as the application would bring the United States' discovery rules closer to the far more limited rules governing discovery in Ecuador (and other civil law countries).  (Moll Decl., Ex. P, at ¶ 29(i).)  Use of amended Rule 26 will therefore prevent Chevron from committing an end-run around Ecuadorian discovery rules by gaining access to information that it otherwise would not be allowed to obtain after December 1, 2010.    Second, the application of amended Rule 26 will not cause Chevron to suffer any prejudice, as Chevron already has received approximately 275,000 pages of documents from over thirty-three different individuals and entities in fifteen jurisdictions.  Finally, because no discovery has occurred to date, this Court may easily apply amended Rule 26 without causing delay or confusion.

When this Court applies the amended Rule 26, such application will require the Court to deny or limit most, if not all, of the far-reaching and duplicative document requests contained in the subpoena directed to Mr. Shefftz.  For example, the first request in Chevron's subpoena,

which seeks both draft expert materials and attorney-expert communications relating to those materials, must be limited.[13]  *See* (Dkt. # 1-3, at 17 (Doc. Request #1)).  Instead, the Court must only allow inquiry into those areas of disclosure permitted by amended Rule 26, such as compensation for the expert's report or testimony, facts or data reviewed by the expert in forming his opinions, or assumptions provided by counsel and relied upon by the expert in forming his opinions.  *See* Fed. R. Civ. P. 26(b)(4)(C) (amendment effective Dec. 1, 2010).

**2.      *Even Assuming that the Amended Version of Rule 26 Should Not Apply, Chevron's Absurdly Broad Proposed Subpoena Exceeds Even What Is Permissible Under the Former Iteration of the Rule***

The purpose of expert discovery is to "convey the substance of the expert's opinion . . . so that the opponent will be ready to rebut, to cross-examine, and to offer a competing expert if necessary."  *Walsh v. Chez*, 583 F.3d 990, 994 (7th Cir. 2009).  In conjunction with a written report, the previous version of Rule 26(a)(2) requires a party to disclose "data or other information considered" by the party's expert in formulating his opinion in the case.  Fed. R. Civ. P. 26(a)(2)(B)(ii).  The term "considered" has been defined to encompass "documents reviewed or generated by the expert [that] could reasonably be viewed as germane to the subject matter on which the expert has offered an opinion."  *Tampa Bay Water v. HDR Eng'g, Inc.*, No. 8:08-cv-2446-T-27TBM, 2010 WL 3394729, at *2 (M.D. Fla. Aug. 26, 2010).  Though this standard applies to a range of expert-related documents, it is not boundless.

---

[13]  In relevant part, the first request of Chevron's subpoena demands "ALL DOCUMENTS RELATING TO the ALLEN EXPORT REPORT, including but not limited to drafts . . . and all COMMUNICATIONS RELATING TO such DOCUMENTS."  *See* (Dkt. # 1-3, at 17 (Doc. Request #1).)

Many of Chevron's overbroad and duplicative document requests are wholly unrelated to anything Mr. Shefftz may have "considered" in actually forming his opinion.   The sixth document request, for example, calls for:

> All COMMUNICATIONS between or among YOU and any PLAINTIFF AFFILIATED PERSON RELATING TO the LAGO AGRIO LITIGATION, CABRERA, the CABRERA REPORTS or PLAINTIFFS' NEW EXPERT REPORTS.

(Barrett Decl., Ex. A, at 13 (Doc. Request 6).)  As this request seeks any communications between Mr. Shefftz and any person having any affiliation with the Lago Agrio litigation, the request is not confined to a time period when Mr. Shefftz would have drafted his report nor is it tailored to apply to communications with individuals who may have assisted Mr. Shefftz in formulating his opinion.

In request number twelve, Chevron asks for, in relevant part:

> All DOCUMENTS RELATING TO websites, File Transfer Protocol sites, or analogous sites or protocols used for the viewing, access, transfer, distribution, uploading, or downloading of DOCUMENTS used or considered by YOU in producing the SHEFFTZ EXPERT REPORT . . . .

(Barrett Decl., Ex. A, at 14 (Doc. Request 12).)  One would be hard-pressed to ascertain how file transfer protocols are germane to the data or facts underlying Mr. Shefftz's opinion expressed in his report.  The thirteenth request calls for:

> All DOCUMENTS RELATING TO the translation (from English to Spanish or Spanish to English) of any DOCUMENT responsive to this subpoena or the SHEFFTZ EXPERT REPORT, including all COMMUNICATIONS with any PERSON who translated such DOCUMENTS.

(Barrett Decl., Ex. A, at 14 (Doc. Request 13).)   The rules require Mr. Shefftz to produce documents considered in forming his expert opinion, not to serve as a source of free translations

for Chevron particularly in a circumstance where, as here, the §1782 Application does not justify

this demand.  The twenty-second document request calls for:

> All DOCUMENTS supporting YOUR statement that the CABRERA REPORTS
> were "prepared by" CABRERA.

(Barrett Decl., Ex. A, at 16 (Doc. Request 22).)  This request is patently impermissible as Mr.

Shefftz is not required by Rule 26 to produce documents having no relation to his own report and

instead having to do with verifying the authenticity of another individual's work product.

Whether the Cabrera Report was prepared by Cabrera is of no consequence to this request for

expert discovery regarding Mr. Shefftz's report.

Not only are Chevron's document requests significantly overbroad and not germane to

the facts or data Mr. Shefftz considered in reaching his opinion, Chevron also seeks privileged

documents protected from disclosure.  At least one court within the First Circuit has concluded

Rule 26 mandates the disclosure of non-opinion work product, including facts divulged by

counsel to the expert, but shields from disclosure counsel's opinions, legal theories, and mental

impressions.  *See Nexxus Products Co. v. CVS New York, Inc.*, 188 F.R.D. 7, 10 (D. Mass. 1999)

("Based on this Court's review of the relevant cases, the text of the rule and the accompanying

Advisory Committee comment, this Court concludes that the required disclosure . . . does not

include core attorney work product considered by the expert."); *see also In re: Cendant Corp.*

*Sec. Litig.*, 343 F.3d 658, 664-65 (3d Cir. 2003) (provisions regarding work product protection

operate independently of expert discovery rules).

While Mr. Shefftz is required to produce factual work product considered in preparing his

report, Chevron is not entitled to core attorney work product – such as the work product sought

in the proposed subpoena's document requests numbers 2 ("All DOCUMENTS PROVIDED to

38

YOU by any PLAINTIFF AFFILLIATED PERSON."), and 6 (All COMMUNICATIONS between or among YOU and any PLAINTIFF AFFILIATED PERSON RELATING TO the LAGO AGRIO LITIGATION, CABRERA, the CABRERA REPORTS or PLAINTIFFS' NEW EXPERT REPORTS.") (Barrett Decl., Ex. A, at 13 (Doc. Requests 2 & 6).) Again, Chevron seeks and is not entitled to Plaintiffs' counsel's opinions, legal theories, and mental impressions.

At *most*, Chevron is entitled to receive any documents considered by Mr. Shefftz in formulating his opinion in the Lago Agrio litigation. But Chevron is *not* entitled to an overbroad universe of documents not restricted by time nor subject matter, nor is Chevron entitled to core attorney work product. Therefore, at minimum, this Court should strike any document requests and topics for examination transgressing the outer limits of the iteration of Rule 26 set to expire on December 1, 2010.

> **B.**    **Chevron Cannot Credibly Argue That Mr. Shefftz May Be Deemed a "Testifying Expert" as to the Arbitration and Any Discovery in Furtherance of the Arbitration Must Be Limited to Mr. Shefftz's Contacts, If Any, with the Government of Republic of Ecuador – Anything Else is Simply Irrelevant to the Arbitration**

Chevron's *Ex Parte* Application collapses its demands for discovery in a form calculated to deprive this Court of the opportunity to separately consider the company's claimed bases for discovery. While Chevron claims that "[Mr. Shefftz] is a testifying expert, is subject to full discovery, and is not shielded by any conceivable privilege," (Dkt. 1-1, at 2), this argument is simply inapposite to the international arbitration. Mr. Shefftz never submitted *any materials* to the international arbitration; nor are the Plaintiffs, who retained Mr. Shefftz, even a party to the Arbitration. Mr. Shefftz cannot be considered a testifying expert in those proceedings.

To the extent this Court grants any discovery in aid of the arbitration, that discovery should be strictly limited to Chevron's "due process" claims – as embodied in the company's Memorial on Merits.  (*See* Dkt. 1-10, ¶ 243-44 (arguing the Lago Agrio Court's issuance of the August 2, 2010 order allowing for supplemental submissions violated Chevron's "due process rights").)  Accordingly, if discovery is ordered at all "in aid" of the Arbitration, Chevron should only be permitted to question Mr. Shefftz only on his contacts (if any) with the Republic of Ecuador and his involvement (if any) in the issuance of the August 2, 2010 Lago Agrio Court order allowing for the submission of expert reports.

## **CONCLUSION**

For the foregoing reasons, Respondent and Plaintiffs respectfully submit that Chevron's *Ex Parte* Application for Discovery Under 28 U.S.C. § 1782 should be denied in its entirety.


DATED:  November 16, 2010

Respectfully Submitted,


By: /s/    Paul T. Milligan
PAUL T. MILLIGAN (BBO # 552574)
Nelson, Kinder, Mosseau & Saturley, P.C
Two Oliver Street
Boston, MA 02109
T: (617) 778-7800
F: (617) 778-7501
E: pmilligan@nkms.com

## CERTIFICATE OF SERVICE

I herby certify that on November 1, 2010, I caused the foregoing Respondent's and Ecuadorian Plaintiffs' Joint Brief in Opposition to Chevron Corporation's *Ex Parte* Application for Discovery Under 28 U.S.C. § 1782  to be filed with the Clerk of Court using CM/ECF system which will send notification of such filing to the following.

Robert L. Ullmann
Nutter McClennen & Fish LLP
Seaport West
155 Seaport Blvd.
Boston, MA 02210

Heather B. Repicky
Nutter McClennen & Fish LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210

Peter E. Seley
Gibson, Dunn & Cruther, LLP
1050 Connecticut Avenue, N.W.,
Washington, D.C. 20036
PSeley@gibsondunn.com

Randy M. Mastro, Esq.
Gibson, Dunn & Cruther, LLP
200 Park Avenue
New York, New York 10166-0193
rmastro@gibsondunn.com

Andrea E. Neuman, Esq.
Gibson, Dunn & Cruther, LLP
3161 Michelson Drive
Irvine, California 92612-4412

ANeuman@gibsondunn.com


*Attorneys for Petitioner*


By: /s/___Paul T. Milligan_____
            PAUL T. MILLIGAN (BBO # 552574)
            Nelson, Kinder, Mosseau & Saturley, P.C
            Two Oliver Street
            Boston, MA 02109
            T: (617) 778-7800
            F: (617) 778-7501
            E: pmilligan@nkms.com

104031